# In the United States Court of Federal Claims

No. 17-879

(Filed:  17 April 2026)<sup>*</sup>

```
**************************************
BIG EASY STUDIOS, LLC,               *
                                     *
              Plaintiff,             *
                                     *
v.                                   *
                                     *
THE UNITED STATES,                   *
                                     *
              Defendant.             *
                                     *
**************************************
```

*William D. Ross, Sr.*, Ross Law Firm, PLLC, of Ridgeland, MS, with whom was *Christopher C. Van Cleave*, of Van Cleave Law, PA, of Biloxi, MS, for plaintiff.

*Anna Bondurant Eley*, Senior Litigation Counsel, Commercial Litigation Branch, Civil Division, with whom were *Reginald T. Blades, Jr.*, Assistant Director, *Patricia M. McCarthy*, Director, *Brett A. Shumate*, Assistant Attorney General, Department of Justice, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE**, **Judge.**

*Caveat manceps rei publicae*.[1]

This forewarning is hardly novel.  On 12 August 1986, President Ronald Reagan uttered his famous adage—"[T]he nine most terrifying words in the English language are:  I'm from the Government, and I'm here to help."  Ronald Reagan Presidential Library and Museum, *The President's News Conference*, 12 August 1986, available at https://www.reaganlibrary.gov/archives/speech/presidents-news-conference-23.  Since then, government contracting has grown to pervade nearly every facet of the American economy, and so too has government contractors' need to beware of the contracts they presume to have entered.

---

<sup>*</sup> This Opinion was originally filed under seal on 13 April 2026 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for proprietary, confidential, or other protected information and submit proposed redactions by 17 April 2026 at 5:00 p.m.  The Court accepts the parties' proposed redactions and reissues the Opinion with redactions as follows:  "[XXXXX]."

[1] "Let the contractor for the government beware."

As government contracting is funded by the people for the people, "[contractors] must turn square corners when they deal with the [g]overnment." *Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920) (Holmes, J.). "But it is also true, particularly when so much is at stake, that 'the [g]overnment should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (Roberts, C.J.) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021) (Gorsuch, J.) ("If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them."). Yet, "the Supreme Court has recognized that any private party entering into a contract with the government assumes the risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947)) (other citations omitted). This means, even if a government actor misrepresented the extent of its authority, the *contractor* is charged with knowing the true extent of the government actor's authority and bears all legal risk if the actor exceeds their authority. Such is the concern here.

*See Abare v. United States*, No. 22-1271, 2026 WL 797115, at *1 (Fed. Cl. Mar. 19, 2026).

This case reviews a very unique set of contracts regarding space vehicle production and moviemaking—a contract dispute regarding plaintiff's lease of the NASA Michoud Assembly Facility to film big-budget Hollywood movies. In 2011, plaintiff and NASA entered the first of three short-term Space Act Agreements governing plaintiff's use of MAF. Encouraged by a contracting officer's efforts to "paper up" a long-term Enhanced Use Lease to supersede the short-term Space Act Agreement, plaintiff understood it also reached a long-term agreement with NASA and expended resources to improve the leased space at NASA MAF in anticipation of a ten-year tenancy. As discussed in detail *infra*, unfortunately for plaintiff the contracting officer had no authority to enter a long-term lease on behalf of the agency, leaving the express short-term Agreements as plaintiff's only legal option for relief. After NASA MAF terminated the last of these short-term Agreements, plaintiff filed suit, alleging four breach of contract claims and requesting equitable estoppel. The government moved for partial summary judgment on all but one of plaintiff's claims. For the following reasons, the Court grants the government's Motion for Partial Summary Judgment.

## I.    Background

### A.    Factual History[2]

---

[2] All facts in this section are undisputed, unless stated otherwise. *See* Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC") (requiring a movant for summary judgment to show "there is no genuine dispute as to any material fact"). The Court draws all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Plaintiff Big Easy Studios, LLC ("Big Easy" or "plaintiff") leased space to produce movies from late 2011 to early 2017 at the National Aeronautics & Space Administration's ("NASA") Michoud Assembly Facility ("MAF") in Louisiana, under a series of Space Act Agreements" ("SAA(s)").  Am. Compl. ¶¶ 15–16, 20, ECF No. 214; Pl.'s Resp. at 4–6, ECF No. 195; Gov't's Mot. for Partial Summ. J. ("MPSJ") at 30, ECF No. 187; Gov't's App'x to Gov't's MPSJ ("Gov't's App'x") at A425 (Amendment No. 7 to Contract SAA8-1416319) (indicating termination date of 31 January 2017).  Prior to Big Easy's incorporation, its founder, Herbert Gains, and a NASA Contracting Officer, Mark York, negotiated a short-term agreement between Paramount Pictures and NASA for use of MAF to shoot the movie *G.I. Joe Retaliation*.  *See* Am. Compl. ¶ 14; Pl.'s Resp. at 4.  This agreement was executed by Robin Henderson, Associate Director of NASA's George C. Marshall Space Flight Center ("MSFC"), and Teri Fournier, Executive Vice President of the Motion Picture Legal Department for Paramount Pictures, as of 2 June 2011.  *See* Gov't's App'x at A78 (Execution Page, Paramount SAA).

The Paramount agreement increased Hollywood interest in MAF, and in October 2011 Mr. York reached out to Mr. Gains to discuss a long-term agreement.  *See* Am. Compl. ¶ 14; Pl.'s Resp. at 4.  On 19 October 2011, Mr. York emailed Mr. Gains indicating his "plan to provide [Mr. Gains] with a draft [Enhanced Use Lease ("EUL")] agreement for [their] new arrangement."  *See* Pl.'s App'x to Pl.'s Resp ("Pl.'s App'x") at PA530 (19 Oct. 2011 Email from York to Gains).  On 9 November 2011, Big Easy was incorporated and, despite no signed agreement between Big Easy and NASA, staff for Big Easy's first movie immediately began prepping MAF for filming, and NASA began authorizing task orders to ready the site.  Pl.'s Resp. at 4–5.  On 10 November 2011, Mr. York presented a deck titled "MAF Enhanced Use Lease Project . . . Decision Requested" to a NASA control board.  *See* Gov't's App'x at A96 (10 Nov. 2011 Control Board Presentation).  Eventually, "the control board . . . approved the ten-year EUL with Big Easy[, but a]ccording to Mr. York, the center board said no, we're not going to approve that."  *See* 3 Nov. 2025 Oral Argument Transcript ("Tr.") at 75:11–14, ECF No. 235 (counsel for plaintiff).  In the latter half of November, Mr. Gains and Mr. York discussed a long-term agreement in the form of a draft EUL.  *See* Pl.'s Resp. at 5.  On 17 November 2011, however, Mr. York emailed Mr. Gains with a draft short-term SAA, which was "basically the same as the Paramount" and "based upon [their] conversations of [the previous] evening."  *See* Gov't's App'x at A120 (17 Nov. 2011 Email from Mr. York to Mr. Gains).  On 18 November 2011, Malcolm Wood, Deputy Chief Operating Officer of MAF, emailed MSFC employees confirming "movie folks [were] moving in and setting up shop[;] Steve Turner is working badging with them[;] and everyone is happy with the results. . . . Execution is next." *See* Pl.'s App'x at PA500 (18 Nov. 2011 Email from Wood).  Ultimately the parties did not execute a long-term EUL—instead, on 2 December 2012, Big Easy and NASA executed a 180-day SAA, SAA8-1111234 ("'234 SAA"), to govern Big Easy's use of MAF.  *See* Pl.'s Resp. at 5–6; Pl.'s App'x at PA617 (Execution Page, '234 SAA).  The '234 SAA was signed by Robin Henderson and Jerry Lathan, a managing partner of Big Easy.  *See id*.  Article 2 of the '234 SAA stated:

> The term of this agreement will be for no longer than one hundred eighty (180) days and the agreement itself is considered by both parties to be temporary in nature; inasmuch as both parties are interested in executing an Enhanced Use Lease (EUL) for a long term transaction similar purpose, scope and

responsibilities.  It is the intent of both parties that the EUL when executed shall supersede this agreement.

Pl.'s App'x at PA604 (Article 2, '234 SAA).

After 2011, plaintiff had no contact with Mark York.  *See* Tr. at 138:17–21 ("[THE COURT:]  [I]s there any evidence of interactions with York in the written record after 2011?  [PLAINTIFF]:  I don't think so, Your Honor.").  Following a 2017 investigation by the NASA Office of the Inspector General ("OIG") revealing [XXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]  *See* Pl.'s Resp. at 17–18; *see also* Pl.'s App'x at PA513 (1 Mar. 2018 NASA OIG Letter); *id.* at PA520 ([XXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXX].  NASA OIG Special Agent Matthew Kelly identified a 26 August 2009 email from Stephen Doering, an associate program manager for the Constellation Program at NASA MCFC, [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]  In this August 2009 email, Mr. Doering requested "to add some additional responsible duties to the MSFOC CO, Mark York" including "identifying, negotiating, and implementing Enhanced Use Lease Agreements" at MAF because "[Mr. York's] expertise and insights [were] well suited to assist [Mr. Doering] in the successful implementation of EUL at MAF."  Pl.'s App'x at PA512 (26 Aug. 2009 Email from Stephen Doering to Earl Pendley and Kellie Craig).  The NASA OIG investigation, however, did not identify any leases entered by Mark York on behalf of NASA.  *See* Tr. at 147:22–148:4 ("[THE COURT:] [D]id Mr. York ever enter into any leases on NASA's behalf?  [THE GOVERNMENT]:  No.  We did a search . . . . We didn't find any evidence that he had signed a lease because he couldn't.");  Tr. at 162:17–19 ("[THE COURT:]  What examples of other leases are there?  [PLAINTIFF]:  I haven't found any, Your Honor.").

From 2011 to 2013, plaintiff and NASA representatives at MAF went back and forth regarding execution of a draft EUL—a long-term agreement to replace the '234 SAA.  *See* Am. Compl. ¶¶ 16, 20.  On 5 March 2012, Jerry Lathan emailed Jim Taylor (a MAF Site Development Coordinator who replaced Mr. York as the point of contact for Big Easy, *see* Pl.'s Resp. at 6), asking to see "a copy of a typical EUL agreement . . . to review the standard language and understand."  *See* Gov't's App'x at A198–99 (5 Mar. 2012 Email from Mr. Lathan to Mr. Taylor).  Mr. Taylor responded the same day with a draft EUL "based on [another potential tenant's] EUL that ha[d] been approved by MSFC and [was] being reviewed by NASA HQ."  *See* Gov't's App'x at A198 (5 Mar. 2012 Email from Mr. Taylor to Mr. Lathan).  The draft included blank signature spaces for Big Easy and Robert Lightfoot, the Director of MSFC.  *See* Gov't's App'x at A230 (Signature Page, Draft 1 EUL).  On 13 November 2012, Mr. Taylor sent Mr. Lathan a "slightly updated version of a potential EUL for Big Easy" asking Mr. Lathan to "review and let [Mr. Taylor] know if there are any difficulties."  *See* Gov't's App'x at A261 (13 Nov. 2012 Email from Mr. Taylor to Mr. Lathan).  This draft included blank spaces for the same two signatories as the first draft—Big Easy and Robert Lightfoot.  *See* Gov't's App'x at A292 (Signature Page, Draft 2 EUL).

In early 2013, a billing dispute arose between NASA and plaintiff:  NASA "advised [plaintiff it] intended to bill [plaintiff] for unoccupied spaces at the same rate . . . it billed for

- 4 -

occupied spaces." *See* Am. Compl. ¶ 19.  An OIG audit of NASA's billing practices with Big Easy related to this billing dispute led NASA to reevaluate its billing practices.  *See* Pl.'s Resp. at 27.  In July 2013, instead of executing a long-term agreement with plaintiff, NASA representatives at MAF had plaintiff sign a second short-term agreement—SAA8-1315496 ("'496 SAA")—which altered billing and occupancy moving forward to match what was reported to OIG.  *See* Am. Compl. ¶ 20; Pl.'s Resp. at 27.  Prior to signing, Mr. Lathan emailed Mr. Wood about the '496 SAA, but also asked to "begin the negotiation of the long term SAA," to which Mr. Wood responded by asking a copied NASA employee to "get us a meeting next week ASAP for this."  *See* Pl.'s App'x at PA533 (Email Chain between Mr. Lathan and Mr. Wood).  Mr. Wood also forwarded Mr. Lathan's email to other NASA employees—but deleted Mr. Lathan's statement about negotiating a long-term SAA from the forwarded version of the email.  *Compare id.* at PA533 (original email with Mr. Lathan mentioning a "long-term SAA") *with id.* at PA534 (Mr. Wood's modified and forwarded version of Mr. Lathan's email to remove mention of the long-term SAA).  The short-term '496 SAA was signed by both Robin Henderson and Jerry Lathan on 11 July 2013.  *See* Gov't's App'x at A318 (Execution Page, '496 SAA).

In January 2014, NASA and plaintiff discussed the term of their agreement as well as plaintiff's concerns over rates charged for unoccupied space and unused services under the '496 SAA.  *See* Am. Compl. ¶¶ 22–23.  Around the same time, NASA informed plaintiff it did not intend to execute a 10-year EUL but instead offered to enter another short-term SAA.  *See id.* ¶ 23.  Plaintiff and NASA's third and final SAA, SAA8-1416319 ("'319 SAA"), was executed the same month—both Robin Henderson and Jerry Lathan signed this agreement as of 10 January 2014 and renewed the agreement by amendment until 31 January 2017.  *See* Gov't's App'x at A400 (Execution Page, '319 SAA), A425 (Amendment No. 7, '319 SAA) (indicating execution date of 10 January 2014 and termination date of 31 January 2017).  Eventually, NASA would refuse to continue leasing the space to plaintiff, instead opting to contract with a previous tenant, with whom NASA had been negotiating in the background.  *See* Am. Compl. ¶ 23.

After plaintiff learned NASA was not interested in executing a long-term contract, plaintiff sought to recover $2,438,216.81 spent to improve MAF based on an understanding the parties would enter a long-term agreement.  *See* Pl.'s Resp. at 6; Gov't's App'x at A441 (5 July 2016 Letter from Mr. Lathan to MAF Director, Deputy COO, and Deputy Chief Counsel) ("As you are aware, NASA promised BES a long term agreement.  In reliance on that promise, BES spent millions of dollars improving NASA owned property with NASA's oversight, consent and approvals.").  On 28 September 2016, Robin Henderson sent a letter declining to compensate plaintiff.  *See* Am. Compl. ¶ 34.

### B.    Procedural History

On 28 June 2017, plaintiff filed its Complaint, alleging five counts and requesting equitable estoppel.  *See* Compl., ECF No. 1.  The government counterclaimed alleging two counts, *see* Gov't's Answer to Pl.'s Compl. and Counterclaim, ECF No. 12, but dropped one count at the close of fact discovery, *see* Gov't's Second Am. Ans. to Pl.'s Compl. and Counterclaim, ECF No. 170.  On 14 August 2024, the government filed a motion for partial summary judgment.  *See* Gov't's MPSJ.  Plaintiff responded, the government replied, and both parties filed sur-replies.  *See* Pl.'s Resp.; Gov't's Reply ("Reply"), ECF No. 197; Pl.'s Sur-Reply

to Gov't's Reply ("Pl.'s Sur-Reply"), ECF No. 202; Gov't's Sur-Reply to Pl.'s Sur-Reply ("Gov't's Sur-Reply"), ECF No. 203.  At the conclusion of briefing, the Court ordered the parties to file a joint status report ("JSR") detailing exactly which counts of the pleadings the government's MPSJ covered.  *See* 28 Feb. 2025 Order Staying the Gov't's MPSJ, ECF No. 205. The parties subsequently amended their pleadings, leaving only four of plaintiff's claims and plaintiff's request for equitable estoppel.  *See* Am. Compl. ¶¶ 35–45, 50; Gov't's Ans. to Am. Compl., ECF No. 215.  On 26 August 2025, the parties submitted a JSR to clarify the government's MPSJ covered only plaintiff's claims related to an implied-in-fact long-term contract.  *See* 26 Aug. 2025 JSR at 2, 5, ECF No. 221.  On 3 November 2025, the Court held a site visit at NASA MAF in New Orleans, LA, immediately followed by Oral Argument on the government's MPSJ at the Hale Boggs Federal Building and United States Courthouse in New Orleans, LA.  *See* 23 September 2025 Order Setting Site Visit and Oral Argument, ECF No. 228. As the parties noted at oral argument, nothing substantive—nor anything not already reflected on the public docket—was discussed or distributed during the site visit.  *See* Tr. at 6:1–18.

## II.    Parties' Arguments

Plaintiff's first claim for relief, "Breach of Contract SAA8-1111234," alleges the government breached the '234 SAA because the contract stated the "parties are interested in executing a[] . . . long term" contract and "inten[d]" to "supersede" the '234 SAA with a long term contract, but the government never executed a written long-term contract.  Am. Compl. ¶¶ 17, 20.  The government argues summary judgment is appropriate on this claim because "statements of intentions 'express only desires, not binding commitments.'"  Gov't's MPSJ at 19 (citing *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997)).  Plaintiff's second claim, "Breach of Contract Implied in Fact," alleges, while no long-term contract was reduced to writing, the "conduct of the parties show[s] . . . their tacit understanding that a contract for a 10 year term was the purpose of their agreement."  Am. Compl. ¶ 39.  The government argues "[a]s a matter of law, Big Easy also did not have an implied-in-fact ten (or more) year lease at NASA" because the express short-term SAAs preclude the existence of an implied contract concerning the same subject matter.  *See* Gov't's MPSJ at 30 (citing *Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed. Cir. 1990).  Moreover, the government argues no implied contract could have existed because Mark York lacked contracting authority to bind NASA to a long-term lease.  *See id.* at 22–23.  Plaintiff's third claim for relief is breach of the implied duty of good faith and fair dealing—the government did not move for summary judgment on this claim.  *See* 26 Aug. 2025 JSR at 2–3 ("The parties are in agreement that the scope of the Third Claim for Relief: Breach of Duty of Good Faith and Fair Dealing is not subject to the Government's MPSJ.").  Plaintiff's fourth claim seeks to recover over $4 million in *quantum meruit* for benefits allegedly conferred on NASA in reliance on its representations regarding a future long-term contract.  Am. Compl. ¶ 45.  While neither party's briefs substantively address *quantum meruit*, in the 26 August JSR, the government argues its MPSJ directly covers plaintiff's *quantum meruit* claim because the MPSJ seeks judgment on all claims stemming from an implied-in-fact long-term contract.  *See* 26 Aug. 2025 JSR at 4–5 (quoting Compl. ¶ 45).  Plaintiff argues the MPSJ does not cover its *quantum meruit* claim because the claim is alternative to its implied-in-fact contract claim.  *See id.* at 3–4.  Lastly, plaintiff's complaint requests equitable estoppel, alleging "NASA should be estopped from denying compensation for losses and damages incurred by [plaintiff] because of NASA's actions and

conduct."  Am. Compl. ¶ 50.  The government seeks summary judgment on plaintiff's equitable estoppel claim, arguing there is no evidence NASA desired or requested the modifications for which plaintiff seeks to recover costs.  *See* Gov't's MPSJ at 35–37.

## III.      Summary Judgment Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A court shall not grant summary judgment if "the dispute about a material fact is 'genuine.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is considered genuine if the "evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.*  "In determining whether there is a genuine issue of material fact, the trial court must assume that the evidence presented by the non-movant is credible and draw all justifiable inferences therefrom in the non-movant's favor."  *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed. Cir. 2001) (citing *Anderson*, 477 U.S. at 255).  The party seeking summary judgment bears the burden of establishing the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the moving party has met this burden, the burden shifts to the non-movant who must present sufficient evidence to show a dispute over a material fact allowing a reasonable factfinder to rule in its favor.  *Anderson*, 477 U.S. at 256–57. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* (citing *Anderson*, 477 U.S. at 248).

## IV.     Which of Plaintiff's Claims the Government's MPSJ Covers

The parties agree the government's MPSJ seeks judgment on plaintiff's first claim (breach of the '234 SAA), second claim (breach of an implied-in-fact long-term contract), and request for equitable estoppel.  *See* 26 Aug. 2025 JSR at 2, 5; Tr. at 9:1–13; Pl.'s Am. Compl. ¶¶ 36, 39, 50.  Similarly, the parties agree the government's MPSJ does not cover plaintiff's third claim for relief (breach of the implied duty of good faith and fair dealing).  *See* 26 Aug. 2025 JSR at 2–3.  As to plaintiff's fourth claim for relief—recovery *in quantum meruit*—the government maintains its MPSJ covers this claim entirely, while plaintiff argues the MPSJ would not impact its *quantum meruit* claims at all.  *See* 26 Aug. 2025 JSR at 3–5.

The government's primary argument at summary judgment is that plaintiff and NASA did not enter an implied-in-fact long-term lease.  *See generally* Gov't's MPSJ; 26 Aug. 2026 JSR at 4 ("The Government's MPSJ maps directly onto these allegations, which relate to an alleged implied-in-fact lease of ten or more years.").  Accordingly, the Court begins its analysis by assessing whether NASA entered an implied-in-fact long-term lease with plaintiff to decide the government's motion for summary judgment on plaintiff's second claim for relief.  *See* Section V, *infra*.  The Court then evaluates whether it has jurisdiction over plaintiff's *quantum meruit* claim (alleged as an alternative claim to breach of implied-in-fact contract) in light of the Court's legal conclusions in Section V.  *See* Section VI, *infra*.  Next, the Court assesses whether plaintiff's request for equitable estoppel is effectively a request for promissory estoppel over which this court lacks jurisdiction.  *See* Section VII, *infra*.  The Court then determines whether summary judgment is appropriate for the government on plaintiff's first claim, breach of the '234 SAA.  *See* Section VIII, *infra*.  Lastly, in light of discussion at oral argument, the Court reviews

next steps for plaintiff's third claim for relief—the alleged breach of the implied duty of good faith and fair dealing.  *See* Section IX, *infra*.

## V.    Whether NASA Entered an Implied-in-Fact Long-Term Lease with Plaintiff

The government argues summary judgment is proper on plaintiff's second claim for relief, breach of an implied-in-fact contract, because "[a]s a matter of law, Big Easy . . . did not have an implied-in-fact ten (or more) year lease at NASA."  Gov't's MPSJ at 30.  To decide summary judgment on plaintiff's second claim for relief, the Court assesses three disputed legal issues regarding whether NASA entered into an implied-in-fact long-term lease with plaintiff.  First, the Court assesses whether NASA's Contracting Officer, Mark York, had authority to bind NASA to a lease with plaintiff.  *See* Section V.A, *infra*.  Second, the Court determines whether the express short-term leases, '234, '496, and '319, between NASA and plaintiff precluded the existence of an implied-in-fact long-term lease.  *See* Section V.B, *infra*.  Third, the Court decides whether NASA institutionally ratified an implied-in-fact long-term lease.  *See* Section V.C, *infra*.

### A.    Whether Mark York Had Authority to Enter a Lease on Behalf of NASA

The government argues plaintiff did not have an implied-in-fact long-term contract with NASA because the contracting officer alleged to have entered this contract, Mark York, lacked authority to bind NASA to a long-term lease.  *See* Gov't's MPSJ at 22–30.  In assessing whether Mark York had authority to bind NASA to a long-term lease, the Court first determines whether Mr. York's contracting warrant conferred express actual authority on Mr. York to enter a lease on behalf of NASA.  *See* Section V.A.1, *infra*.  The Court then assesses whether an email from NASA employee, Stephen Doering, delegated leasing authority to Mr. York.  *See* Section V.A.2, *infra*.  Finally, the Court evaluates whether Mr. York possessed implied actual leasing authority. *See* Section V.A.3, *infra*.

#### 1.    Whether Mark York's Contracting Warrant Conferred Express Actual Leasing Authority on Mark York

The government argues Mr. York did not have authority to bind NASA to a lease because Mr. York's contracting warrant only conferred authority to procure up to $2.5 million in goods and services.  *See* Tr. at 140:25–141:12.  "A contract with the United States . . . requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (citation omitted).  Express actual authority exists when a statute, regulation, or contract delegates authority to a government actor.  *See Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344–46 (Fed. Cir. 2007).  Thus, Mr. York's contracting warrant and governing Federal Acquisition Regulation ("FAR") regulations are instructive in determining whether Mr. York had authority to bind NASA to a lease.  *See id.*  Mr. York's contracting warrant conferred authority to procure up to $2,500,000 on behalf of "NASA/George C. Marshall Space Flight Center" "in conformance with Subpart 1.6 of the Federal Acquisition Regulation."  *See* Gov't's App'x at A460 (Mr. York Contracting Warrant).  Subpart 1.6 of the FAR concerns contracting authority limited to "contract[ing] for authorized supplies and services."  *See* FAR 1.601.  Absent additional delegation pursuant to statute and regulation, Mr. York's contracting warrant limits his

contracting authority to procuring a maximum of $2.5 million in *supplies and services* on behalf of NASA/George C. Marshall Space Flight Center. *See id.*; Gov't's App'x at A460 (Mr. York Contracting Warrant). While plaintiff argues NASA gave Mr. York "unfettered authority" to enter leases on behalf of NASA, plaintiff concedes this authority purportedly came from an internal NASA email—not from Mr. York's contracting warrant. *See* Tr. at 141:13–25 ("[THE COURT:] [D]o you agree that York had no authority to bind NASA into a lease? [PLAINTIFF]: Absolutely not. I think NASA gave him unfettered authority and I think that that's clear. THE COURT: And where did his authority come from? [PLAINTIFF]: The August 26th, 2009 email where, you know, [Stephen Doering is] saying that Mark's role is critical to the success of this need to bring commercial tenants into NASA . . . ."); Tr. at 152:20–153:3 ("THE COURT: The only express actual authority he could have is from the email. [PLAINTIFF]: That's the only evidence that I have of it so far"). In short, the text of Mr. York's contracting warrant, the relevant regulatory text, and plaintiff's concessions at oral argument all confirm Mr. York's contracting warrant did not include authority to enter leases on behalf of NASA. *See* Gov't's App'x at A460 (York Contracting Warrant); FAR 1.601; Tr. at 141:13–25, 152:20–153:3. Thus, the Court finds Mr. York could not have entered an implied-in-fact long-term lease on behalf of NASA based solely on the authority conferred in his contracting warrant. *See id.*; *Trauma*, 104 F.3d at 1325.

### 2. Whether Stephen Doering's August 2009 Email Delegated Express Actual Leasing Authority to Mark York

In response to the government's argument no implied long-term lease could have existed because Mr. York lacked leasing authority, plaintiff argues Mr. York was delegated leasing authority through an August 2009 email from Stephen Doering, an associate program manager for the Constellation Program at NASA MCFC. *See* Pl.'s Resp. at 12–13; Tr. at 141:13–25, 152:20–153:3. In full, Mr. Doering's email states:

Earl, Kellie,

Per our conversation, this email is to document my request to add some additional responsible duties to the MSFOC CO, Mark York. I would like to task Mark with assuming the lead role for Site Development Coordination. As such he will be responsible for identifying, negotiating, and implementing Enhanced Use Lease Agreements (EUL) at MAF. The implementation of the EUL process at MAF is extraordinarily important for the Facility, the Center, and the Program. It will allow the efficient use of underutilized space at MAF. This is in direct response to formal direction from NASA HQ, AA's for both ESMD and SOMD to increase the non-NASA commercial tenants at MAF and to use the resulting revenue stream to offset the Agency cost of maintaining this facility.

Mark's expertise and insights are well suited to assist me in the successful implementation of EUL at MAF, and the position of Site Development Coordinator is critical to that success. I have spoken with Mark of my intent to increase his responsibilities above and beyond that of a typical Contracting Officer, but that it would have to be coordinated with you both before implementation.

Thank you for your support to MAF

Gov't's App'x at A464.  Critically, the penultimate sentence of the email notes Mr. Doering spoke "with Mark of [his] intent to increase his responsibilities above and beyond that of a typical Contracting Officer, but that it would have to be coordinated with [Earl Pendley and Kellie Craig] before implementation."  *Id.*  Given Mr. Doering notes his "email is to document [his] *request* to add some additional responsible duties to the MSFOC CO, Mark York," the email reflects, at most, a *request* to delegate, rather than evidence of a completed delegation to Mr. York.  *Id.* (emphasis added).  The plain language of the email further reflects Mr. Doering recognized his email was not enough to delegate authority, as he explicitly notes the addition of responsibilities to Mr. York's plate would have to be coordinated among others at NASA before taking effect.  *See id.* (noting an "increase [to Mr. York's] responsibilities . . . would have to be coordinated with [email recipients] both before implementation"); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.").  As a result, Mr. Doering does not purport to unilaterally grant Mr. York such responsibilities, nor does his email evidence anything beyond a mere request to delegate authority to Mr. York.  *Id.*

Assuming Mr. Doering's email somehow did attempt to evidence a completed delegation to Mr. York, in view of the government's statement NASA leasing authority could be delegated to senior management officials, *see* Tr. at 144:25–145:25, the Court next determines whether Mr. Doering or any of the other email recipients could have delegated leasing authority to Mr. York through Mr. Doering's email.  For Mr. Doering's email to delegate express actual leasing authority to Mr. York, the email must constitute a delegation of leasing authority as authorized by the Constitution, statute, or regulation.  *See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990).  Considering the sole piece of evidence plaintiff cites as an express delegation of leasing authority to Mr. York is Mr. Doering's email, at summary judgment, the Court is tasked with determining whether this email conferred leasing authority on Mr. York pursuant to relevant statutes and regulations.  *See City of El Centro*, 922 F.2d at 820; Tr. at 152:20–153:3 ("THE COURT:  The only express actual authority he could have is from the email.  [PLAINTIFF]: That's the only evidence that I have of it so far").  Relevant statutes at the time vested leasing authority in the NASA Administrator.  *See* 51 U.S.C. 20113(e) (effective from Dec. 18, 2010 to Nov. 25, 2015); 51 U.S.C. 20145(a) (effective from Dec. 18, 2010 to Nov. 18, 2011); 51 U.S.C. 20145(a) (effective from Nov. 18, 2011 to Mar. 21, 2017).  From there, the applicable Code of Federal Regulations delegated leasing authority "to the Associate Administrator for Management Systems and Facilities and the Director, Facilities Engineering Division."  *See* 14 C.F.R. 1204.504(a) ("14 CFR Ch. V 1-1-10 Edition").  The version of 14 C.F.R. 1205.504 applicable at the time also delegated limited leasing authority to Directors of Field Installations and allowed redelegation to "only two senior management officials of the appropriate field installation."  *See* 14 C.F.R. 1204.504(d)–(f) ("14 CFR Ch. V 1-1-10 Edition").  Thus, according to the applicable statutes and regulations, determining if Mr. Doering's email conferred express actual leasing authority to Mr. York depends on whether:  (1) the email shows a "Director[] of [a] Field Installation[] . . . redelegated [leasing] authority" to Mr. York, and (2)

Mr. York was a "senior management official[] of the Field Installation concerned." *See* 14 C.F.R. 1204.504(d)–(f) (14 CFR Ch. V 1-1-10 Edition).

Mr. Doering sent the email to Earl Pendley and Kellie Craig, and copied recipients James Bramblett, Ursula Patterson, Danny Hightower, Robin Henderson, William Bailey, and Clyde Jones. Gov't's App'x at A464 (26 Aug. 2009 Email from Mr. Doering to NASA Employees). As the government notes, and plaintiff does not dispute, none of the individuals on Mr. Doering's email were Directors of a Field Installation. *See* Tr. at 144:25–146:13. Mr. Doering was a program manager and Deputy Director, and therefore not a Director of a Field Installation with delegation authority. *See* 14 C.F.R. 1204.504(d)–(f) (14 CFR Ch. V 1-1-10 Edition); Gov't's App'x at A464 (26 Aug. 2009 Email from Mr. Doering to NASA Employees) (stating Mr. Doering's position in his email signature); Tr. at 144:25–145:25 ("[THE GOVERNMENT:] Stephen Doering, who is the Author of this August 26, 2009 email, as we pointed out, is someone who is basically at the level of the Deputy Director of Marshall. So that puts him as it -- in the category of someone that's even lower than the director of a field installation"). Given the regulations allow a Director of a Field Installation to delegate limited leasing authority to two senior management officials, it is possible Mr. Doering was a "senior management official" and a Director of a Field Installation could have redelegated the Director's leasing authority to Mr. Doering under 14 C.F.R. 1204.504. The regulation, however, is silent about a senior management official—potentially someone like Mr. Doering—then re-redelegating authority he received to someone else; plaintiff has also not identified any alternative legal avenue for a senior management official to redelegate leasing authority to Mark York. *See* 14 C.F.R. 1204.504(d)–(f) (14 CFR Ch. V 1-1-10 Edition).

As to the other email recipients, the government listed their positions at oral argument, and plaintiff did not contest the government's contention no recipient was a Director of a Field Installation with delegation authority:

> Big Easy didn't dispute -- the others on the email -- Robin Henderson is an associate director of Marshall; Earl Pendley and Kellie Craig are contracting officers who have goods and services warrants like Mark York does; and Mr. -- there are three human resources folks. Again, they're not in the CFR chain. And then there's William "Cliff" Bailey, who has been assistant to then MAF Director Sheila Cloud. Again, I mean, no one on this email has lease authority in excess of five years.

*See* Tr. at 146:1–13. Moreover, beyond the limitation of 14 C.F.R. 1204.504 (which only permits redelegation of leasing authority through a Director of a Field Installation), the regulation also limited redelegation to "only two senior management officials of the Field Installation." Nowhere in plaintiff's briefing does plaintiff present any legal authority to demonstrate a contracting officer such as Mr. York would be considered a senior management official of a Field Installation. *See generally* Pl.'s Resp.; Pl.'s Sur-reply; *see also* NASA Procedural Requirement 1600.1, Chapter 10 (effective Nov. 3, 2004 to Oct. 22, 2013) (defining "Senior Management Official [as] Agency or Center management personnel at Division Chief or higher level" in the Glossary of Terms). Accordingly, considering plaintiff failed to substantiate those on the email possessed authority to delegate leasing authority to Mr. York and to establish Mr. York was a senior management official who could receive such a delegation pursuant to 14

- 11 -

C.F.R. 1204.504, the Court finds Mr. Doering's email did not confer express actual leasing authority to Mr. York because no person on the email had the authority to make such a delegation. *See* 14 C.F.R. 1204.504; *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1401 (Fed. Cir. 2016) ("A Government agent must have actual authority to bind the Government to a contract.") (citations omitted); *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993) ("The government is not bound by its agents acting beyond their authority and contrary to regulation.").

### 3.    Whether Mark York Possessed Implied Actual Leasing Authority

Having determined Mr. York lacked express actual authority to bind NASA to a lease, the Court next reviews whether Mr. York had implied authority to enter leases on behalf of NASA. In response to the government's opening argument Mr. York lacked *express* authority, plaintiff insists the government failed to demonstrate Mr. York lacked *implied* leasing authority. Pl.'s Resp. at 19–20. The government, in its reply, contended Mr. York did not possess implied actual authority because leasing was not an integral part of his duties. *See* Gov't's Reply at 6–7. "Actual authority may be either express or implied." *Liberty Ammunition, Inc.*, 835 F.3d at 1402 (citations omitted). For actual authority to be implied, the authority must be "an 'integral part of the duties assigned to the government representative.'" *Id.* (quoting *Landau*, 886 F.2d at 324). "Authority is integral [so as to establish implied actual authority] 'when the government employee could not perform his or her assigned tasks without such authority.'" *Id.* (citing *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)). Even when certain actions may appear to be an integral part of the duties of a government official, such officials' authority is still limited by express statutory and regulatory requirements. *See Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998).

The Court first assesses whether Mr. York "could [] perform his [] assigned tasks without [NASA leasing] authority" to determine whether entering into leases is an integral part of Mr. York's duties. *Liberty Ammunition*, 835 F.3d at 1401. Plaintiff did not articulate in its briefs or at oral argument how entering a lease would be integral to Mark York's contracting warrant duties to procure supplies and services up to $2,500,000 on behalf of "NASA/George C. Marshall Space Flight Center" "in conformance with Subpart 1.6 of the Federal Acquisition Regulation." *See id.*; Gov't's App'x at A460 (Mr. York Contracting Warrant). Plaintiff also has not shown how the inability to enter leases would preclude Mr. York from procuring supplies and services within the confines of his contracting warrant to such an extent he "could not perform his . . . assigned tasks without [leasing] authority." *Liberty Ammunition*, 834 F.3d at 1402. Indeed, when pressed at oral argument, neither plaintiff nor the government could identify any instance (outside of the implied-in-fact lease plaintiff alleges here) where Mr. York entered a lease on behalf of NASA. *See* Tr. at 162:15–19 ("[THE COURT:] What examples of other leases are there? [PLAINTIFF]: I haven't found any, Your Honor."); Tr. at 147:22–148:4 ("THE COURT: [Counsel for the government], did Mr. York ever enter into any leases on NASA's behalf? [THE GOVERNMENT]: No . . . We didn't find any evidence that he had signed a lease because he couldn't."). As further evidence Mr. York did not enter into leases on NASA's behalf, all express short-term leases plaintiff entered with NASA were signed by the Associate Director of MSFC, Robin Henderson—not Mr. York. *See* Pl.'s App'x at PA617 (Execution Page, '234 SAA); Gov't's App'x at A318 (Execution Page, '496 SAA), A400

- 12 -

(Execution Page, '319 SAA); *see also id.* at A78 (Execution Page, Paramount SAA) (negotiated by Mr. York, but signed by Robin Henderson).  The draft long-term leases also left blank spaces for the signature of the Director of MSFC—not a contracting officer nor a site development coordinator.  *See* Gov't's App'x at A230 (Signature Page, Draft 1 EUL), A292 (Signature Page, Draft 2 EUL).

Instead of arguing leasing authority was integral to Mr. York's duties, plaintiff proffers two categories of evidence purportedly exhibiting Mr. York's implied leasing authority:  (1) depositions and emails from NASA officials expressing their understanding Mark York had authority to enter leases on behalf of NASA; and (2) Mark York's previous contracting activity beyond the bounds of his contracting authority in non-leasing contexts.  *See* Pl.'s Resp. at 12–16.

First, plaintiff contends three NASA officials understood Mr. York had leasing authority.  *See id.*  As one example, plaintiff purports NASA Contracting Officer Joe Eversole, in his deposition, agreed "NASA gave him the implied authority to accomplish what they wanted to do."  Pl.'s Resp. at 15 (citing Pl.'s App'x at PA13 (Deposition of Joe Eversole)) ("[Q]: Would that mean that NASA gave him the implied authority to accomplish what they wanted him to do? [A:]  Yeah.  That's exactly what I was talking about, the reason why the program manager is not the contracting officer, what I spoke of previously.  It's unusual, if not the first time, maybe, I've ever seen it in my career, where someone who is running a program would also have contractual authority.  That's correct.") (objection omitted).  [XXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]  s a final example, plaintiff asserts the Stephen Doering email shows Mr. Doering understood Mr. York had authority beyond the bounds of his contracting warrant.  *See* Pl.'s Resp. at 12–14.  While plaintiff cites several NASA officials' understanding of Mr. York's authority, the Federal Circuit has held a government agent's understanding of authority does not impact authority.  *See Trauma*, 104 F.3d at 1325.  Moreover, statements from NASA officials describing their understanding of the types of contracts Mr. York had authority to enter do not relieve the Court of its "duty . . . to observe the conditions defined by Congress for charging the public treasury."  *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. at 385.  The Court need not reach the government's objections to plaintiff's characterization of such testimony, because, even if plaintiff's characterizations are correct, none of these officials' understandings of Mr. York's authority impact whether Mr. York had implied actual authority nor demonstrate how leasing was integral to Mr. York's warranted duties.  *See id.*; *see also Trauma*, 104 F.3d at 1325.

Second, plaintiff argues Mark York previously contracted beyond the bounds of his contracting authority, [XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX]  In *Liberty Ammunition*,

the Federal Circuit held the infrequency of contracting activity surpassing authority runs counter to a conclusion such activity is integral to a government actor's duties. *See Liberty Ammunition*, 835 F.3d at 1402. There, the government actor signed NDAs beyond his contracting authority, but the Federal Circuit held he signed NDAs too infrequently for such action to be integral to the actor's duties. *Id.* Here, although plaintiff raises [XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXX] *See* Tr. at 162:15–19. Indeed, aside from the implied contract alleged here, plaintiff has not identified any other lease Mr. York executed on behalf of NASA. *See id.* As the Federal Circuit held infrequent contracting activity is not enough for implied authority, and plaintiff cannot identify *any* leasing activity by Mr. York apart from the alleged implied contract, it follows [XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX] is insufficient to establish Mr. York had implied leasing authority. *See Liberty Ammunition*, 835 F.3d at 1402. As a result, because plaintiff failed to identify *any* past leasing activity by Mr. York despite robust NASA leasing, plaintiff's argument [XXXXXXXXXXX] reveals entering leases was integral to Mr. York's duties fails as a matter of law. *See id.* (finding limited instances of the unauthorized contracting activity were still insufficient to establish implied actual authority).

Even if plaintiff could show leasing authority was integral to Mr. York's duties, plaintiff must also show any statutory or regulatory framework outlining the bounds of leasing authority did not limit Mr. York's authority. *See Salles v. United States*, 156 F.3d 1383, 1384 (Fed. Cir. 1998). As explained in Section V.A.2, *supra*, an extensive statutory and regulatory framework outlines how NASA leasing authority works and operates independent of contracting officers such as Mark York. 51 U.S.C. 20113(e) (effective from Dec. 18, 2010 to Nov. 25, 2015); 51 U.S.C. 20145(a) (effective from Dec. 18, 2010 to Nov. 18, 2011); 51 U.S.C. 20145(a) (effective from Nov. 18, 2011 to Mar. 21, 2017); 14 C.F.R. 1204.504. This statutory and regulatory framework delegates leasing authority to the "Associate Administrator for Management Systems and Facilities and the Director, Facilities Engineering Division" but allows for these officials to delegate more limited leasing authority to "Directors of Field Installations" and "two senior management officials." 14 C.F.R. 1204.504(a), (d)–(f). Given statutes and regulations explicitly designate leasing authority to government representatives other than Mr. York, leasing authority cannot be integral to Mr. York's procurement duties. *See Salles*, 156 F.3d at 1384. Moreover, plaintiff cannot claim ignorance of such limitations on Mr. York's authority when they are detailed in statute and regulation. *See Fed. Crop Ins. Corp.*, 332 U.S. at 384. Accordingly, because the uncontroverted facts cannot legally establish leasing authority was integral to Mr. York's duties, the Court determines Mr. York lacked implied actual leasing authority as a matter of law. *Schism v. United States*, 316 F.3d 1259, 1299 (Fed. Cir. 2002) (affirming summary judgment and finding "no actual authority existed" to conclude "plaintiffs' claim must fail as a matter of law."). Having determined Mr. York did not have express or implied actual leasing authority as a matter of law, NASA and plaintiff did not enter into an implied-in-fact contract. *See id.*; *Trauma*, 104 F.3d at 1325; *see also* Tr. at 135:9–19 ("THE COURT: Was York the one negotiating a long-term contract with plaintiff? [PLAINTIFF]: He's the one that entered into an agreement of a long-term contract with plaintiff.").

**B.    Whether the Express SAAs Preclude the Existence of an Implied-in-Fact Long-Term Lease**

In addition to Mr. York lacking authority to enter into a long-term implied-in-fact contract with plaintiff, the government also argues no implied-in-fact long-term lease could have existed because the parties executed several express short-term SAAs governing the exact same subject matter as the alleged implied lease. *See* Gov't's MPSJ at 30. In response, plaintiff argues the parties' prior conduct evidences their understanding of an implied long-term agreement, notwithstanding the express short-term SAAs. *See* Pl.'s Resp. at 24–26. Before addressing the government's legal argument, the Court first assesses whether, drawing all inferences in the light most favorable to plaintiff, the undisputed facts show the parties mutually assented to an implied long-term lease. *See* Section V.B.1, *infra*. Then the Court addresses the government's legal argument to determine whether the express short-term SAAs preclude the existence of an implied-in-fact long-term lease. *See* Section V.B.2, *infra*.

### 1.    Whether the Facts Show Mutual Intent to Enter an Implied-in-Fact Long-Term Contract

Before assessing the government's legal arguments regarding express contracts precluding implied contracts, the Court first assesses whether the undisputed facts viewed in the light most favorable to plaintiff could establish the parties' mutual intent to enter an implied-in-fact long-term contract. In plaintiff's view, "Big Easy and York clearly had a meeting of the minds of what they were agreeing to when things kicked off in November of 2011," because "[t]his was not their first movie deal together and they had already worked through most of the issues with movie making co-existing with NASA." Pl.'s Resp. at 25. Moreover, according to plaintiff, "everyone involved at NASA and everyone at Big Easy knew there was an agreement in place and the parties were moving forward accordingly." *Id*. Specifically, plaintiff argues, prior to execution of an express short-term SAA, NASA's task orders for floor repairs, security changes, network and phone capability, as well as plaintiff's capital improvements and assembling of movie staff, all show the parties' intent to enter an implied long-term lease agreement. *See id.* at 25–26.

At oral argument, the Court sought a clear timeline of the facts related to plaintiff's claim of an implied-in-fact long-term contract with NASA. According to plaintiff: (1) the implied-in-fact long-term contract started in October 2011; (2) Big Easy was formed on 9 November 2011; (3) performance under the implied-in-fact long-term contract began on 16 November 2011; and (4) the first short-term SAA was executed on 2 December 2011. *See* Tr. at 52:23–53:8, 110:16–24; Pl.'s Resp. at 4. Plaintiff agreed multiple written drafts of the long-term agreement—the same agreement plaintiff argues was implied—were circulated between plaintiff and NASA well into 2012, but never executed. *See, e.g.*, Tr. at 76:4–18, 135:9–21 (plaintiff agreeing with the Court there is no executed written copy of a long-term implied-in-fact contract).

For an implied-in-fact contract, mutual intent is "'inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (quoting *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923)). Although parties' conduct could show tacit understanding and evidence mutual intent, "if parties dealing with each other with the view of

arriving at a contract intend that their negotiations shall be finally reduced to writing and signed by them as evidence of the terms and conditions of the agreement, there exists no binding contract until the written contract setting forth such terms and conditions is executed." *Ship Constr. & Trading Co. v. United States*, 91 Ct. Cl. 419, 456, *cert. denied*, 312 U.S. 699 (1941).

The issue for the Court is to determine whether the parties' continued negotiations of a long-term lease substantiates plaintiff's claim an implied long-term lease was formed in October 2011. *See id.* Months after plaintiff argues the implied contract began, plaintiff and NASA repeatedly exchanged drafts of the very long-term contract plaintiff argues was implied. *See* Gov't's App'x at A198 (5 Mar. 2012 Email from Mr. Taylor to Mr. Lathan), A230 (Signature Page, Draft 1 EUL), A261 (13 Nov. 2012 Email from Mr. Taylor to Mr. Lathan), A292 (Signature Page, Draft 2 EUL). Plaintiff agreed at oral argument, although the parties' negotiations were intended to result in execution of a long-term contract, the parties never executed a long-term agreement. *See* Tr. at 58:1–12, 135:9–21; *see also* Gov't's App'x at A198 (5 Mar. 2012 Email from Mr. Taylor to Mr. Lathan), A230 (Signature Page, Draft 1 EUL), A261 (13 Nov. 2012 Email from Mr. Taylor to Mr. Lathan), A292 (Signature Page, Draft 2 EUL); *cf. Ship Constr.*, 91 Ct. Cl. at 456. At oral argument, plaintiff also read an email, with subject line "Movie Task Orders," from NASA representatives noting "they love the arrangement," listing numerous tasks to be completed, and stating "execution is next." *See* Tr. at 58:1–12; *see also* Pl.'s App'x at PA500 (18 Nov. 2011 Email from Mr. Wood to MAF employees). Plaintiff argued, by "execution," NASA "mean[t] the long-term agreement." *See* Tr. at 58:1–12. The express short-term lease which plaintiff and NASA eventually executed on 2 December 2011 (the '234 SAA) explicitly stated: "both parties are interested in *executing* an Enhanced Use Lease (EUL) for a long term transaction similar purpose, scope and responsibilities." *See* Gov't's App'x at A158 ('234 SAA) (emphasis added). Moreover, back-and-forth communication among the parties as to execution of a long-term agreement continued well after the parties had entered a "stopgap" short-term lease—plaintiff's own brief references Mr. Lathan still reaching out to NASA as late as 8 July 2013 "to begin negotiation of the long term SAA." *See* Pl.'s Resp. at 9 (citing Pl.'s App'x at PA425–26 (Dep. of Mr. Shoemaker); Pl.'s App'x at PA533 (Email Chain between Mr. Lathan and Mr. Wood); Gov't's App'x at A198 (5 Mar. 2012 Email from Mr. Taylor to Mr. Lathan), A261 (13 Nov. 2012 Email from Mr. Taylor to Mr. Lathan). In plaintiff's view, the "stopgap" SAA agreements were mere formalities while NASA sought to "finalize the paper on the long-term agreement." *See* Tr. at 112:1–3; *see also* Tr. at 47:9–17. As plaintiff described the arrangement, however, "NASA continued to say, hey we're going to give you this long-term agreement, and in the process of that, you're going to have to enter these short-term agreements *until we get that finalized*." *See* Tr. at 20:12–15 (emphasis added). In sum, the undisputed facts show plaintiff and NASA: (1) signed a short-term contract expressing the parties mutual interest in executing a long-term contract in the future; (2) exchanged written drafts of a long-term agreement for months after plaintiff argues the implied contract began; (3) sought to reduce any long-term arrangement to writing; and (4) never executed or reduced such an agreement to a writing. As the undisputed facts show the parties never executed a contract despite continuing to negotiate a long-term agreement, and because binding caselaw precludes the existence of a contract when contracting parties "intend that their negotiations shall be finally reduced to writing," *Ship Constr.*, 91 Ct. Cl. at 456, the Court finds

the parties intended their negotiations be finally reduced to writing, so no long-term leasing arrangement could have existed until reduced to writing.[3]  *Ship Constr.*, 91 Ct. Cl. at 456.

### 2.    Whether the Express SAAs Preclude an Implied Contract

The government also argues the parties' express short-term lease agreements—the '234, '496, and '319 SAAs—preclude the existence of an implied long-term lease agreement.  *See* Gov't's MPSJ at 30.  In *Atlas Corp. v. United States*, the Federal Circuit held "[t]he existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract."  895 F.2d 745, 754–55 (Fed. Cir. 1990).  Plaintiff argues *Atlas Corp.* does not bar the existence of the implied contract here because "the SAA covers a temporary agreement for five years or less, whereas the EUL covers a long-term agreement for ten years or more."  *See* Tr. at 50:23–51:14 ("[T]hose are two totally different instruments.  And that's why we think the *Atlas* bar doesn't apply in this case.").  Thus, the issue for the Court to decide at summary judgment is whether a difference in the term length of the short-term SAAs renders the alleged long-term implied-in-fact contract "entirely unrelated" to the short-term SAAs.  *See Atlas Corp.*, 895 F.2d at 754–55.

The plain language of the parties' short-term SAAs is instructive in determining their relation to the alleged long-term implied-in-fact contract.  At oral argument, the Court noted the first express short-term lease between plaintiff and NASA references the parties' intention to eventually enter a long-term lease in the form of an EUL.  *See* Tr. at 74:12–15.  In full, the short-term lease's reference to an EUL is as follows:

> The term of this agreement will be for no longer than one hundred eighty (180) days and the agreement itself is considered by both parties to be temporary in nature; inasmuch as both parties are interested in executing an Enhanced Use Lease (EUL) for a long term transaction similar purpose, scope and responsibilities.  It is the intent of both parties that the EUL when executed shall supersede this agreement.

Gov't's App'x at A158 ('234 SAA).  Considering plaintiff and NASA's contract language describes the alleged long-term implied-in-fact lease as a "long term transaction *similar* [in] purpose, scope and responsibilities," this language alone is enough to show the short-term lease is not "entirely unrelated" to the implied long-term lease.  *See Atlas*, 895 F.2d at 754–55.  This language contradicts plaintiff's argument the two instruments are "entirely unrelated" under *Atlas* because the plain language of one of the instruments expressly notes the other would cover "similar purpose, scope and responsibilities."  *See id.*  The Court confronted plaintiff on this point at oral argument, asking how any long-term lease could be implied in the presence of the '234 contract language noting the parties' intentions to enter a long-term lease—plaintiff simply

---

[3] Of note, Mr. York did not sign any of the short-term SAA contracts on behalf of NASA and none of these contracts were signed by a contracting officer or site development coordinator such as Mr. York—all were signed by Robin Henderson, the Associate Director of MSFC.  *See* Section V.A.3, *supra.*  Thus, to the extent plaintiff argues mutual assent was reached regarding the terms of an implied-in-fact long-term contract based on Mr. York's representations, such an argument lacks merit considering Robin Henderson was the NASA representative entering leases with plaintiff on behalf of NASA.

replied, "[t]hat's a fair point." *See* Tr. at 74:12–15.  Moreover, beyond stating the SAAs were merely "stopgap" formalities in furtherance of an implied long-term contract, plaintiff could not explain why the parties continued negotiating terms of a long-term lease if there was a long-term contract already in place.  *See* Tr. at 75:1–18, 76:4–18.  Considering plaintiff entered several express short-term SAAs covering tenancy at MAF and because the plain language of the SAAs explicitly state they cover similar purpose, scope, and responsibilities as a long-term tenancy at MAF, the express SAAs preclude the existence of an implied long-term lease.  *See Atlas*, 895 F.2d at 754–55.

### C.        Whether NASA Institutionally Ratified an Implied Long-term Contract

Having determined Mr. York lacked authority to enter into a long-term contract with plaintiff and the parties' prior conduct and SAAs preclude the existence of a long-term implied-in-fact contract, the Court finally evaluates plaintiff's argument in response to the government's lack of long-term lease argument:  whether NASA institutionally ratified an implied long-term lease with plaintiff by knowingly accepting the benefits of such a contract.  *See* Pl.'s Resp. at 22.  The government argues institutional ratification is absent because:  (1) NASA headquarters' general awareness of moviemaking does not equate to knowledge of a long-term contract when there were active short-term contracts; and (2) any benefits accepted by NASA were done so under short-term SAAs, not under an implied long-term lease.  Gov't's Reply at 13–14.

To decide whether summary judgment is appropriate for the government on plaintiff's institutional ratification arguments, the Court assesses whether the undisputed facts viewed in the light most favorable to plaintiff show NASA knowingly accepted the benefits of an implied long-term lease.  *See, e.g.*, *Janowsky v. United States*, 133 F.3d 888, 891–92 (Fed. Cir. 1998) ("The Court of Federal Claims erred . . . without considering whether the agency ratified the proposed contract . . . by allowing the sting operation to continue and by receiving the benefits from it.  A genuine issue of material fact thus exists concerning the contract claim.").  Plaintiff's factual support for institutional ratification comprises NASA prepping MAF for plaintiff's moviemaking (such as through expensive floor repairs); NASA headquarters personnel observing plaintiff's moviemaking; and NASA accepting lease payments.  *See* Pl.'s Resp. at 23; Tr. at 168:6–16.  All this activity is not only undisputed by the government but also directly contemplated by multiple short-term express leases in place from 2011 to 2016.  *See* Tr. at 60:11–14; *see also, e.g.*, Gov't's App'x at A161 (Article 6.D, '234 SAA) ("MAF shall make reasonable efforts to assure that the NASA-provided Property is useable"), A157 (Article 2, '234 SAA) ("use of MSFC-MAF for the purpose of supporting the production of films"), A159–60 (Article 5, '234 SAA) (detailing payments).  To the extent such activity pre-dated execution of the first short-term lease by a few weeks in 2011, for the reasons analyzed extensively in Section V.B, *supra*, plaintiff fails to explain why such activity should instead be attributed to an implied long-term lease when negotiations over execution of a long-term lease continued well into 2012.  *See* Section V.B, *supra*.  Likewise, plaintiff fails to explain how knowledge and acceptance of the benefits of a long-term lease, such as lease payments, can be distinguished from lease payments for the executed short-term lease agreements.  *See Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 ("[R]atification must also be based on a demonstrated acceptance of the contract.").  Even if plaintiff could demonstrate factual disputes as to

institutional ratification, the Federal Circuit has explicitly held the "existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract." *Atlas*, 895 F.2d at 754–55. Considering knowledge and acceptance of the benefits of an implied long-term lease are precluded by the existence of several short-term leases and ongoing negotiations of a long-term lease, plaintiff's institutional ratification claims fail as a matter of law.[4] *See Harbert/Lummus*, 142 F.3d at 1434; *Atlas*, 895 F.2d at 754–55.

As discussed *supra*, Mr. York lacked actual authority to enter into a long-term contract with plaintiff, and the parties' prior conduct and express short-term contracts preclude the existence of a long-term implied-in-fact contract—plaintiff's institutional ratification claim also fails as a matter of law. *See* Sections V.A–V.C, *supra*. Accordingly, the Court grants summary judgment for the government on plaintiff's second claim for relief, breach of an implied-in-fact long-term contract, because no such contract existed.

## VI.    Whether the Court Has Jurisdiction over Plaintiff's *Quantum Meruit* Claim

The Court next turns to the government's MPSJ as it relates to plaintiff's fourth claim for relief, *quantum meruit*. Except for a brief reference in the government's reply brief, neither parties' briefs mention plaintiff's fourth claim for relief. *See* Gov't's Reply at 1 ("The United States requests summary judgment as to Counts I, II, and IV of Big Easy's complaint, to the extent that Count IV is premised on allegations that, like Count II, involve a lengthy implied-in-fact lease."). The parties also filed a JSR in which the parties disputed whether the government's MPSJ sought judgment on plaintiff's fourth claim for relief. *See* 26 Aug. 2025 JSR at 3–5. Accordingly, the Court first summarizes the parties' positions on whether the MPSJ covers *quantum meruit*, as outlined in the 26 August 2025 JSR. Then, in light of discussion of this claim at oral argument, the Court assesses whether it has jurisdiction to hear plaintiff's *quantum meruit* claim.

In the 26 August 2025 JSR, the parties disputed whether the government's MPSJ covers plaintiff's *quantum meruit* claim. *See id.* According to the government, its MPSJ seeks judgment on all claims stemming from an implied-in-fact long-term lease, including plaintiff's *quantum meruit* claim. *See id.* at 4. Plaintiff contends the MPSJ does not cover *quantum meruit* because the claim is alternative to its claim for relief under the implied long-term contract and

---

[4] Plaintiff also advanced a novel theory, titled "effective authority," as a new form of institutional ratification. *See* Pl.'s Resp. at 23–24. Plaintiff, however, conceded in its briefing this theory has no basis in caselaw: "there is no case law identified thus far directly on this point regarding effective authority." *Id.* at 24. Moreover, at oral argument, plaintiff abandoned this theory and agreed the record evidence contains no factual support for "effective authority." *See* Tr. at 164:3–7 ("I think we meant implied authority, Your Honor"); *compare* Pl.'s Resp. at 23–24 (arguing effective authority created when the government turned a blind eye to Mr. York's contracting activities), *with* Tr. at 162:15–19 (plaintiff conceding it had not identified any example of Mr. York entering a lease on behalf of NASA other than the alleged implied lease). Accordingly, considering plaintiff conceded its novel theory lacked caselaw support and failed to factually support its theory, and in view of the Court's implied authority and institutional ratification analyses in Sections V.A, V.C, *supra*, the Court determines plaintiff's "effective authority" argument fails to establish the existence of a long-term implied-in-fact contract as a matter of law. *See United States v. Minnesota Mut. Inv. Co.*, 271 U.S. 212, 217 ("An implied contract in order to give the Court of Claims or a district court under the Tucker Act jurisdiction to give judgment against the government must be one implied in fact and not one based merely on equitable considerations and implied in law.") (citations omitted).

seeks relief regardless of the enforceability of any contract. *See id.* at 3–4. Plaintiff clarified "the damages [plaintiff seeks] in this claim . . . are the value of . . . structural improvements [to NASA in the amount of $]2,291,000 . . . [and] the ongoing benefits as a result of those improvements, which would include things such as improved electric bills from the extensive insulation, [and] improved flooring." *See* Tr. at 115:10–19. Plaintiff also seeks "overcharges for unoccupied space and technology charges," which, when combined with the $2,291,000 sought for improvements, results in a total of $4,000,000 for damages sought. *See* Am. Compl. ¶ 45. The government contends the claimed "overcharges" would not be covered by the MPSJ but, when properly construed, are "simply damages for the alleged breaches of the implied duty of good faith and fair dealing . . . encompassed in the Third Claim for Relief." 26 Aug. 2025 JSR at 5.

At oral argument, the parties narrowed the dispute regarding *quantum meruit* to whether such a claim can proceed absent an implied-in-fact contract. *See, e.g.*, Tr. at 115:6–7, 116:10–117:5. The government argues plaintiff's *quantum meruit* claim fails because plaintiff's claim is "premised entirely on the existence of an implied-in-fact lease" and no such lease exists. *See* Tr. at 115:6–7. Moreover, the government cites *Trauma* and *Amdahl* to argue the mere receipt of benefits by the government is not enough for plaintiff to recover *in quantum meruit*—rather plaintiff must establish the existence of an implied-in-fact contract. *See* Tr. at 120:15–121:12 (citing *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed. Cir. 1986); *Trauma*, 104 F.3d 1321). Plaintiff cites *Prestex* to argue, even if an implied-in-fact contract fails to materialize, plaintiff may still recover the benefits conferred on the government, so plaintiff's *quantum meruit* claim should proceed as an alternative claim. *See* Tr. at 116:10–117:5 ("[I]f we're unsuccessful in demonstrating the existence of an implied-in-fact contract, then this is an alternative claim for relief.") (citing *Prestex Inc. v. United States*, 320 F.2d 367, 373 (Ct. Cl. 1963)).

"A recovery in *quantum meruit* is based on an implied-in-law contract. That is, a contract in which there is no actual agreement between the parties, but the law imposes a duty in order to prevent injustice." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007). "The Court of Federal Claims, however, lacks jurisdiction over contracts implied in law" such as *quantum meruit*. *Id.* (citing 28 U.S.C. § 1491(a)(1) (2000)). An exception to the jurisdictional restriction for *quantum meruit* claims exists when a plaintiff confers benefits on the government under a contract that is later rescinded. *See United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed. Cir. 1986). This exception is narrow, however, and only allows recovery "for the value of conforming goods or services received by the government *prior to the recission of the contract for invalidity*." *See Int'l Data Prods. Corp.*, 492 F.3d at 1325–26 (quoting *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1329–30 (Fed. Cir. 2006)) (emphasis added).

As this court only has jurisdiction over *quantum meruit* claims involving recovery of benefits conferred prior to rescission of a contract, the sole question at summary judgment is whether plaintiff's *quantum meruit* claim seeks "the value of conforming goods or services received by the government prior to the recission of [a] contract for invalidity." *See Int'l Data Prods. Corp.*, 492 F.3d at 1325–26 (citations omitted). Plaintiff described its *quantum meruit* claims as alternative to its implied-in-fact contract claims (in the event its implied-in-fact contract claims are unsuccessful) to instead recover benefits plaintiff conferred on NASA. *See*

- 20 -

Tr. at 117:1–12 ("[I]f we're unsuccessful in demonstrating the existence of an implied-in-fact contract, then this is an alternative claim for relief. . . . If we got compensated in the implied-in-fact contract claim for the ten-year value of the lease, right, we wouldn't also get the value of the improvements because we made the improvements in order to be able to make movies for that period of time.").  In other words, plaintiff does not seek to recover the value of benefits it conferred on NASA pursuant to a contract later rescinded for invalidity, but instead seeks to recover the benefits allegedly conferred pursuant to a mistaken understanding an implied contract existed.  *See id.*  Federal Circuit precedent is clear:  "[t]he assertion of *quantum meruit* as a basis for calculating damages cannot rescue an implied-in-fact theory of recovery that is otherwise not cognizable."  *Seh Ahn Lee v. United States*, 895 F.3d 1363, 1374 (Fed. Cir. 2018).  As a result, because plaintiff does not seek benefits it conferred prior to the rescission of a contract, the Court does not have jurisdiction to hear plaintiff's *quantum meruit* claims.  *See id.*; *Int'l Data Prods. Corp*, 492 F.3d at 1326 ("The Desktop V contract, however, is neither invalid nor unenforceable.  Thus, this exception does not apply."); *see also* RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").  Plaintiff cites *Prestex* to dispute this jurisdictional restriction applies here, arguing "the court [in *Prestex*] held . . . when parties negotiate toward a formal contract that fails to materialize and one party confers benefits that the other accepts with knowledge, you know, then an implied-in-fact contract may exist for benefits conferred."  *See* Tr. at 116:21–117:1.  The holding in *Prestex*, however, does not support plaintiff's argument—the decision explained "[i]n certain *limited fact situations*, therefore, the courts will grant relief of a quasi-contractual nature *when the Government elects to rescind an invalid contract*."  *See Prestex*, 320 F.2d at 373 (emphasis added).  The Federal Circuit has repeated the narrow holding in *Prestex* multiple times, including in *Amdahl*, which afforded this court jurisdiction over *quantum meruit* claims only in the same limited circumstance, in which "a contract is void *ab initio* or . . . voidable."  *See Amdahl*, 786 F.2d at 395.  Because plaintiff's *quantum meruit* claims do not allege a contract was entered but later rescinded, and because the Court finds no alleged implied-in-fact contract was ever entered, this Court does not have jurisdiction to entertain plaintiff's *quantum meruit* claims and grants summary judgment for the government on Claim IV in full.  *See Int'l Data Prods. Corp.*, 492 F.3d at 1326 ("The Desktop V contract, however, is neither invalid nor unenforceable. Thus, this exception does not apply."); *Seh Ahn Lee*, 895 F.3d at 1374 ("The assertion of *quantum meruit* as a basis for calculating damages cannot rescue an implied-in-fact theory of recovery that is otherwise not cognizable."); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

## VII.    Whether Equitable Estoppel Precludes the Government from Denying the Existence of a Long-Term Contract

The Court next assesses the government's motion for summary judgment on plaintiff's request for equitable estoppel.  The government argues summary judgment is proper on plaintiff's equitable estoppel claim because "the key legal elements of an equitable estoppel claim are insurmountably absent in this case."  Gov't's MPSJ at 34–35.  Specifically, "[t]o succeed in its claim [of equitable estoppel, a plaintiff must show:]  (1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.  It also

must show that the government engaged in affirmative misconduct, and that the . . . personnel in question were acting within the scope of their authority." *SUFI Network Servs., Inc. v. United States*, 755 F.3d 1305, 1325 (Fed. Cir. 2014) (cleaned up).[5] The government argues plaintiff has no basis to assert the government misled it as to a long-term contract because plaintiff signed a short-term contract noting a long-term contract was not yet executed. *See* Gov't's MPSJ at 37. Further, according to the government, affirmative misconduct is absent because: (1) there is no evidence Mr. York or NASA intended to trick plaintiff; (2) expressing interest in a contract without executing one is not affirmative misconduct; (3) Mr. York actually did seek approval for a long-term contract; and (4) Mr. York's successor drafted two versions of a long-term contract, both of which plaintiff rejected by objecting to the terms of one and ignoring the other. *See* Gov't's MPSJ at 35–37.

Plaintiff responds equitable estoppel is proper in view of "the government's efforts to deny the existence of an implied-in-fact ten-year agreement," especially considering "great animosity between" NASA contracting officers who "worked with others on types of 'shenanigans' and otherwise to thwart Big Easy's agreement with NASA." *See* Tr. at 125:14–16; Pl.'s Resp. at 28. According to plaintiff, the government's knowledge of true facts, plaintiff's ignorance of these facts, and plaintiff's detrimental reliance are present and establish the elements necessary for equitable estoppel in three ways. *See* Pl.'s Resp. at 26–28. First, plaintiff argues NASA MAF knew (but plaintiff did not know) MAF would have to share cost proceeds with NASA HQ under a long-term contract but not under a short-term contract. *See id.* at 27. As a result, plaintiff argues it "acted on York's representation there would be a minimum 10-year deal" and "spent $2.4 million it would not have if it had known of MAF's conflicted interest." *See id.* Second, plaintiff argues NASA MAF knew (but plaintiff did not know) it was misreporting short-term agreements as long-term agreements to NASA OIG. *See id.* Plaintiff contends it expended costs without knowing an OIG audit would uncover the misreporting and hold up plaintiff's movie production. *See id.* Third, plaintiff argues NASA was aware (but plaintiff was not aware) of animosity between Malcom Wood, the MAF facility director, and Mark York, resulting in plaintiff's expenditures in anticipation of a long-term relationship which NASA appeared to favor (per Mr. York), but in reality did not (per Mr. Wood). *See id.* at 28.

"The doctrine of equitable estoppel is applied when a party attempts to prevent denial of a contract." *New Am. Shipbuilders, Inc. v. United States*, 15 Cl.Ct. 141, 144 (1988), *aff'd*, 871 F.2d 1077 (Fed. Cir. 1989) (citing *Pac. Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 340 (1983), *aff'd*, 738 F.2d 452 (Fed. Cir. 1984)). "[E]quitable estoppel is inapplicable" when "there was no contract," *id.*, because "[a]n estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made," *Union Mut. Life Ins. Co. v. Mowry*, 96 U.S. 544, 547 (1877). In other words, equitable estoppel, unlike promissory estoppel, is not a standalone cause of action to enforce an otherwise unenforceable contract, but instead

---

[5] The government cited *JANA, Inc. v. United States*, 936 F.2d 1265 (Fed. Cir. 1991) for the elements of equitable estoppel in its brief, but since *JANA* the Federal Circuit rejected the four-element test for equitable estoppel in *JANA* and instead used the three-element test from *SUFI Networks*. *See Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1361 (Fed. Cir. 2011) ("As an initial matter, we agree with both parties that the Board failed to analyze estoppel under the correct legal test, the equitable estoppel test set forth in *Aukerman*."); *see generally* Gov't's MPSJ at 35. The Federal Circuit has also added affirmative misconduct and government authority as additional requisites for a successful equitable estoppel claim. *See SUFI*, 755 F.3d at 1325. As a result, the Court employs the three-element test and the additional requisites from *SUFI Networks* in its analysis.

acts to bar another party's legal arguments denying the validity of a contract. *See, e.g.*, *Law Mathematics & Tech., Inc. v. United States*, 779 F.2d 675, 678–79 (Fed. Cir. 1985) (defining promissory estoppel); *see also New Am. Shipbuilders*, 15 Cl. Ct. at 144 ("First, it appears that the plaintiff is actually attempting to argue promissory estoppel.  Plaintiff is trying to create a contract which does not exist.  However, promissory estoppel applies to contracts implied-in-law, over which this court does not have jurisdiction.") (citations omitted).  "It is well established that the Court of Federal Claims does not have jurisdiction over such claims [as promissory estoppel]." *Piotrowski v. United States*, 722 F. App'x 982, 985 n.1 (Fed. Cir. 2018).

At summary judgment, the Court addresses two issues regarding plaintiff's request for equitable estoppel.  First, the Court evaluates whether plaintiff's request for equitable estoppel is sufficiently different from promissory estoppel such that the Court has jurisdiction over plaintiff's request.  Second, the Court evaluates, if it has jurisdiction over plaintiff's request, whether plaintiff can establish affirmative misconduct on the part of NASA to justify plaintiff's request for equitable estoppel.

First, the Court decides whether plaintiff successfully distinguishes its request for equitable estoppel from a promissory estoppel claim.  Plaintiff seeks to estop "the government's efforts to deny the existence of an implied-in-fact ten year-agreement," *see* Tr. at 125:14–16, and bar NASA "from denying compensation for losses and damages," Am. Compl. ¶ 50.  To the extent plaintiff asserts a standalone estoppel claim to recover on a contract, this Court already determined an implied-in-fact ten year-agreement did not exist, *see* Section V, *supra*, so such a request for estoppel would amount to promissory estoppel, over which this Court lacks jurisdiction.  *See Piotrowski*, 722 F. App'x at 985 n.1 ("It is well established that the Court of Federal Claims does not have jurisdiction over such claims [as promissory estoppel]."); *New Am. Shipbuilders*, 15 Cl. Ct. at 144 (1988) ("First, it appears that the plaintiff is actually attempting to argue promissory estoppel.  Plaintiff is trying to create a contract which does not exist.") (citations omitted).  At oral argument however, plaintiff sought to distinguish its claims from promissory estoppel, instead arguing it merely asks the Court to prevent the government from denying the existence of a contract on grounds of equity.  *Compare* Tr. at 125:19–21 ("THE COURT:  So equitable estoppel is not a standalone cause of action?  [PLAINTIFF]:  Well, I think it is a standalone cause of action."), *with* Tr. at 129:3–17 ("THE COURT:  So the argument is that the denial is to stop against the affirmative misconduct of denying a contract . . . that should otherwise have existed.  [PLAINTIFF]:  You stated it much more clearly than I.").  Considering the functional effect of granting plaintiff relief on this newly stated claim would be to grant recovery on a contract this Court has already determined did not exist, *see* Section V, *supra*, plaintiff's claim as articulated at oral argument still amounts to promissory estoppel—meaning the Court would still lack jurisdiction.  *See New Am. Shipbuilders*, 15 Cl. Ct. at 144; *Piotrowski*, 722 F. App'x at 985 n.1.  Accordingly, because plaintiff seeks to recover damages by equitably preventing the government from denying the existence of a contract the Court already determined does not exist—meaning plaintiff's equitable estoppel claim amounts to promissory estoppel—the Court lacks jurisdiction over the claim.  *See Piotrowski v. United States*, 722 F. App'x 982, 985 n.1 (Fed. Cir. 2018); RCFC 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Next, assuming the Court had jurisdiction to adjudicate what plaintiff frames as a request

for equitable estoppel, the Court assesses whether plaintiff can show affirmative misconduct on the part of NASA.  To establish sufficient grounds for equitable estoppel, plaintiff must show the government's affirmative misconduct induced plaintiff's reliance.  *SUFI Network Servs.*, 755 F.3d at 1325.  As evidence of affirmative misconduct inducing its reliance, plaintiff asserts:  (1) a conflict of interest at NASA MAF resulting in NASA MAF's preference for short-term contracts; (2) NASA MAF misreporting short-term contracts to NASA OIG leading to delays for plaintiff's moviemaking when an audit occurred; and (3) animosity between a NASA facility director and Mark York, creating another barrier to plaintiff's realization of a long-term contract while it expended costs in anticipation of one.  *See* Pl.'s Resp. at 26–28.  For two reasons, none of these three assertions show affirmative misconduct inducing its reliance.  First, plaintiff and NASA executed several express short-term contracts, one of which explicitly laid out the short-term contract was in place until a long-term agreement could be reached.  *See* Gov't's App'x at A158 ('234 SAA) ("the agreement itself is considered by both parties to be temporary in nature; inasmuch as both parties are interested in executing an Enhanced Use Lease").  Second, the parties' negotiations of a long-term contract continued for months, and plaintiff knew no long-term agreement had been executed.  *See* Gov't's App'x at A198 (5 Mar. 2012 Email from Mr. Taylor to Mr. Lathan), A230 (Signature Page, Draft 1 EUL), A261 (13 Nov. 2012 Email from Mr. Taylor to Mr. Lathan), A292 (Signature Page, Draft 2 EUL).  At most, plaintiff demonstrates NASA did not disclose internal politics about a preference for short-term contracts—but this factual showing fails to overcome what plaintiff acknowledges:  plaintiff and NASA were still working towards, and had not yet executed, a long-term contract.  *See id.*  Thus, NASA's conduct cannot rise to the level of affirmative misconduct which would have led plaintiff to believe a long-term transaction had been reached.  *See SUFI Network Servs.*, 755 F.3d at 1325 (requiring misleading conduct, reliance on the conduct, material prejudice, and affirmative misconduct to prove equitable estoppel).  Finally, plaintiff's equitable estoppel claim is premised on "[Mr.] York's representation there would be a minimum 10-year deal."  *See* Pl.'s Resp. at 27.  For a successful equitable estoppel claim, the Federal Circuit requires the "personnel in question were acting within the scope of their authority."  As discussed extensively in Section V, *supra*, Mr. York lacked the requisite authority to bind NASA MAF to a long-term lease.

As a result, in addition to the Court's lack of jurisdiction over plaintiff's claim framed as equitable estoppel, the uncontroverted facts cannot establish NASA engaged in affirmative misconduct to bar it from denying the existence of a long-term contract—the parties continued negotiating but never executed the long-term contract, the parties entered several express short-term contracts, and, even if affirmative misconduct were present, Mr. York lacked leasing authority.  Accordingly, summary judgment is proper for the government on plaintiff's equitable estoppel claim.  *See, e.g.*, *New Am. Shipbuilders*, 871 F.2d at 1081 (affirming summary judgment against plaintiff's equitable estoppel claims).

## VIII.   Whether NASA Expressly Breached the Terms of Contract SAA8-1111234

The government argues summary judgment is appropriate on plaintiff's first claim for relief, breach of the '234 SAA, because "statements of intentions 'express only desires, not binding commitments.'"  Gov't's MPSJ at 19 (quoting *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1481 (Fed. Cir. 1997)).  Plaintiff alleges the government breached its obligations

under the '234 SAA because, despite contractual language stating the "parties are interested in executing a[] . . . long term" contract and stating the parties "inten[d]" to "supersede" the '234 SAA with a long term contract, the government never executed a written long-term contract, opting instead for more short-term contracts. Am. Compl. ¶¶ 17, 20; *see also* 26 Aug. 2025 JSR ("Plaintiff's First Claim for Relief: Breach of Contract SAA8-1111234 . . . is limited to the allegation that NASA breached this contract by failing to execute a long term EUL"). The government argues the contractual language in the '234 SAA did not amount to a contractual promise to enter a long-term contract because it is merely a statement of intentions, and "there is no evidence of a mutual intent to contract on any specific terms, no unambiguous offer and acceptance, and no authority by Mr. York or anyone else at MAF or [MSFC] to bind the agency to a lease in excess of five years." Gov't's MPSJ at 19. Plaintiff's briefs did not address breach of the '234 SAA. *Cf.* Pl.'s Resp. In its reply, the government cites plaintiff's failure to address breach of the express contract as plaintiff's "abandoning its express contract claims." Gov't's Reply at 2. Moreover, at oral argument, plaintiff agreed the '234 SAA did not impose any express obligation to enter a long-term contract. *See* Tr. at 103:15–21 ("THE COURT: [Plaintiff], you were alleging that Article 2 provides some express promise for an enhanced use lease? [PLAINTIFF]: I don't think so, Your Honor. I mean, honestly, in looking at this, I don't think that -- I don't think that it's a promise for a future agreement."). Likewise, plaintiff confirmed at oral argument it does not allege any breach of the other two express agreements, '496 and '319. *See* Tr. at 27:21–28:2 ("THE COURT: So the 496 and 319 . . . did you allege express breaches for those? [PLAINTIFF]: The complaint does not allege -- does not expressly allege express breaches of those contracts."). Even if plaintiff did not abandon this claim, the plain language of the '234 SAA explicates "both parties [were] interested in . . . a long term transaction" and "inten[ded]" such a transaction would supersede the express lease, but does not contain any language indicating the parties' mutual present intent to any specific contractual terms comprising the hoped-for long-term transaction. *See* Gov't's App'x at A158 (Article 2, '234 SAA); *see also Mod. Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed. Cir. 1992) ("The plain language of the BPA, thus, appears to be contemplative of future contracts. There is no language indicating any present intent that either party be bound."). As Federal Circuit precedent states contractual statements of intent are not contractually binding, *see Barsebäck Kraft*, 121 F.3d at 1481, and considering plaintiff agrees the '234 SAA does not contain contractually binding language committing NASA and plaintiff to a long-term lease, NASA did not breach the '234 SAA in failing to enter a long-term contract; the Court accordingly grants summary judgment for the government on plaintiff's first claim for relief, breach of contract (SAA8-1111234). *See Mod. Sys. Tech. Corp.*, 979 F.2d at 202 (affirming summary judgment).

## IX.    Next Steps for Plaintiff's Implied Duty of Good Faith and Fair Dealing Claim

While the government did not move for summary judgment on plaintiff's third claim for relief (breach of the implied duty of good faith and fair dealing), discussion at oral argument revealed the Court's legal conclusions in this Order could impact the viability of that claim. Specifically, at oral argument, both parties initially agreed an implied duty of good faith and fair dealing claim could not move forward absent a predicate express breach. *See* Tr. at 16:2–5, 21:5–12. The government wavered from this position, however, noting the implied duty of good faith and fair dealing could be breached without an express breach if a party acts to "frustrate[ the] bargain." *See* Tr. at 28:18–29:14. Plaintiff further noted the implied duty cannot create

- 25 -

duties inconsistent with terms of contract but nonetheless argued NASA had "extra contractual duties." *See* Tr. at 11:12–14.

While the implied duty of good faith and fair dealing may not require a breach of an express contractual duty, *see Metcalf Const. Co. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014), the duty "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions," *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). As the Court has already determined no implied-in-fact long-term contract existed, *see* Section V, *supra*, to the extent plaintiff alleges breach of the implied duty of good faith and fair dealing stemming from the alleged implied contract, plaintiff's claim would fail as a matter of law. *See Metcalf Const.*, 742 F.3d at 991 ("The implied duty of good faith and fair dealing is limited by the original bargain"). Given the government did not move for summary judgment on plaintiff's implied duty of good faith and fair dealing claims regarding express contracts '234, '496, and '319, the Court does not address the viability of these claims here. Both parties, however, noted "damages discovery" could clarify issues of liability as to plaintiff's implied duty claims. *See* Tr at 35:5–13, 168:21–169:22. The government noted it did not move for summary judgment on this claim due to lack of clarity on the confines of plaintiff's claim. *See* Tr. at 18:13–16. In sum, the government stated: (1) a standalone breach of the implied duty can survive absent an express breach if a party complies with the terms of a contract but does so unreasonably; (2) the government may have some "exposure" on plaintiff's implied duty claims; and (3) damages discovery may clarify these claims, after which the government may move for summary judgment again. *See id.*; Tr. at 168:22–169:22.

Accordingly, the Court orders the parties to submit a joint status report within sixty days of the issuance of this order detailing the parties' proposed next steps regarding damages discovery and plaintiff's third claim for relief. Specifically, the parties should detail: (1) whether, in light of this Opinion and Order, additional damages discovery is necessary before plaintiff's implied duty of good faith and fair dealing claims can be addressed; (2) if damages discovery is necessary, a proposed discovery schedule; (3) whether the parties' discussions clarify the scope of plaintiff's claim such that motions practice may render discovery unnecessary; and (4) if the parties elect motions practice instead of discovery, a proposed briefing schedule for the motions.

## X.    Conclusion

For the foregoing reasons, the Court **GRANTS** the government's Motion for Partial Summary Judgment, ECF No. 187, on plaintiff's First Claim for Relief: Breach of Contract SAA8-1111234; Second Claim for Relief: Breach of Contract Implied in Fact; Fourth Claim for Relief: Alternative Claim on Quantum Meruit Basis; and Equitable Estoppel claims. The parties **SHALL FILE** a joint status report **on or before 12 June 2026** in accordance with this Opinion and Order detailing the parties' proposed next steps regarding damages discovery and plaintiff's Third Claim for Relief: Breach of Duty of Good Faith and Fair Dealing.

**IT IS SO ORDERED.**

- 26 -

- 27 -

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge